319 Ga. 562
FINAL COPY

S24A0633. JOHNSON v. THE STATE.

PETERSON, Presiding Justice.

Deand're Dwayne Johnson appeals his convictions related to the stabbing death of Louis Tyler and non-fatal assault of Vicki Robinson.[1] On appeal, Johnson argues that the trial court plainly

---

[1] The crimes occurred on November 10, 2018, and Louis died the next morning. A DeKalb County grand jury indicted Johnson on December 18, 2018, and a subsequent reindictment was returned on September 5, 2019, charging Johnson with malice murder (Count 1), felony murder (Counts 2 to 4), aggravated assault of Louis (Count 5), first degree burglary (Count 6), aggravated stalking (Count 7), aggravated assault of Robinson (Count 8), and possession of a knife during the commission of a felony (Count 9). At an October 2019 trial, the jury found Johnson guilty of all counts. The trial court sentenced Johnson to a total of life without the possibility of parole plus 25 years. Specifically, the trial court sentenced Johnson to life without the possibility of parole for Count 1, vacated Counts 2 to 4, purported to merge Counts 5 to 7 with Count 1, sentenced Johnson to 20 consecutive years in custody for Count 8, and sentenced Johnson to five consecutive years in custody for Count 9. Although there may have been a merger error with respect to the burglary and aggravated stalking counts, we decline to address that issue here because any error benefited the defendant and the State has not challenged the merger of those counts. See *Dixon v. State*, 302 Ga. 691, 697-698 (4) (808 SE2d 696) (2017) (explaining that even when no party raises a merger error, we have discretion to correct it on direct appeal, but when the error benefits the defendant and the State fails to raise it by cross-appeal, we exercise our discretion to correct the error only in exceptional circumstances). Johnson timely moved for new trial on November 26, 2019, and amended that motion through new counsel on June 30, 2023. After a hearing on August 14, 2023, the trial court denied the

erred by failing to charge impeachment of a witness based on bias, failing to charge knowledge, failing to charge the defense of accident, and permitting a witness to testify about the victim's hearsay statement. Johnson has not shown that the trial court clearly erred by omitting the instructions regarding the impeachment of a witness based on bias, knowledge, or accident, and Johnson has failed to show how any error related to the trial court's admission of the alleged hearsay testimony likely affected the outcome. Therefore, Johnson's claims of plain error fail, and we affirm.

The evidence at trial showed the following. Johnson and Jasmine Tyler began dating in May 2016. They had one son, K. J., together in September 2017 and broke up in August 2018. Upon breaking up, Johnson and Jasmine agreed that Johnson would watch K. J. while she worked, and K. J. otherwise lived with Jasmine at her grandmother's house down the road from where Johnson lived. Jasmine later arranged for her father, Louis Tyler,

_____

motion on September 28, 2023. Johnson filed a timely notice of appeal through appellate counsel, and the case was docketed to the April 2024 term of this Court and submitted for a decision on the briefs.

and his long-term girlfriend, Vicki Robinson, to watch K. J. instead of Johnson.

On October 23, 2018, Johnson "pop[ped] up" at Louis and Robinson's apartment uninvited, and Robinson let Johnson in to see K. J. At Louis's request, Robinson asked Johnson to leave, and Johnson responded that calling the police was "the only way [she] was going to be able to stop him[,]" "forcibly took" K. J., bruising Robinson, ran from the apartment, and got in a car that drove away.[2] Robinson called the police, who found Johnson with K. J. and returned K. J. to her; an audio recording of this call was played for the jury. Johnson never legitimized his relationship with K. J. and did not see K. J. much after that incident.

On October 31, 2018, Johnson texted Jasmine two photographs of her grandmother's car with a broken window and communicated

---

[2] Johnson testified in his own defense that he took K. J. because he did not think the apartment was the best place for K. J.'s health, given that he was sick and the apartment smelled like cigarette smoke. According to Johnson, the physical struggle arose because Robinson "was elbowing [K. J.] in the stomach basically trying to forcefully keep [K. J.] away from" him. Johnson claimed that another relative "pulled [Robinson] off" of K. J. and him, letting them go.

that someone had tried to break into her grandmother's car. Jasmine was at work and called Louis, who arrived at her grandmother's house around midnight and called the police. Jasmine testified that she believed that Johnson did it, and when she challenged Johnson via text message as to whether he had called the police to report the broken window like Johnson told her that he had, Johnson told her "don't come back on this street" and that his "cousin was going to basically beat [her] up." He also sent threatening text messages about Louis, saying he was "going to beat [that] man to sleep[.]"At trial, when asked if there was "any sort of altercation, verbal or physical, between [Louis] and the defendant[,]"[3] the following exchange ensued:

> JASMINE: Yes. My father said that he hit him.
> STATE: Deand're hit your dad?
> JASMINE: Yes. Deand're hit my father.

Johnson did not object. Similarly, Robinson testified that Louis called and placed her on speaker phone during that encounter, and

---

[3] It is unclear from the record whether Jasmine's testimony referred to an altercation between Louis and Johnson "that night" or "ever."

that Johnson had punched Louis in the stomach after Louis told him to stop "doing all this foolishness" and "to grow up and get a job and start taking care of his son." Johnson did not object to this testimony, which he elicited on cross-examination. Johnson also elicited Robinson's testimony that police who responded to the scene concluded that Louis had instigated the incident.

In the early morning of November 2, 2018, Robinson had K. J. at her apartment when she heard a "big boom" as though a tree had fallen on the house. She looked out her bedroom window and saw Johnson running behind the apartment. In the living room, she saw a "big boulder rock through [her] whole front window" and called 911, and an audio recording of this call was played for the jury. Louis and Robinson pressed charges against Johnson; Jasmine testified that Johnson admitted to her that he broke Louis and Robinson's window.

On the same day, Jasmine obtained an ex parte temporary restraining order prohibiting Johnson from "harassing, harming, or abusing the Petitioner's family or household" and stating that

5

Johnson had no legal right to visit and had no custodial rights regarding K. J. Johnson "kept calling" and texting Louis and Robinson about K. J. so much that they "had to . . . turn the phone off in order to go to sleep [and] to go to work."[4]

Jasmine testified that on November 3, 2018, before the restraining order was served, she received a text message with a picture of herself in a dress, reading "this is the nice dress to die in."[5] Jasmine called the police, who arrived on the scene but informed her there was nothing they could do absent the order being served; an audio recording of that call was played for the jury. Also on that date, Robinson overheard a phone call between Louis and Johnson in which Johnson said that he "wanted to apologize" but did not admit

---

[4] A cell phone extraction of Louis's cell phone, displayed to the jury, revealed 43 calls and nine text messages from different phone numbers associated with Johnson to Louis's phone between November 2, 2018, and November 10, 2018. While some call logs indicated that Louis's phone was answered, the records show no communications initiated from Louis's cell phone to the numbers associated with Johnson.

[5] Although Jasmine did not associate the phone number sending that message with Johnson, Johnson immediately texted her again from another number displaying knowledge about the threatening text message and blaming the message on his cousin. And Jasmine testified that Johnson routinely contacted her from multiple numbers.

to breaking Louis and Robinson's window. The restraining order was served on November 7, 2018.

Robinson testified that around 7:00 a.m. on November 10, 2018, when K. J. was at Louis and Robinson's apartment, Johnson called Louis and Robinson because he "wanted to bring the baby some money[,]" but they declined the money. At one point, Louis left the apartment, but he returned shortly after seeing Johnson walking near the apartment. Around 7:30 or 8:00 p.m., a neighbor knocked on their door and said, "this guy asked [him] to knock on your door to tell you it's a old friend out here who wants to see you." Robinson testified that they assumed it was Johnson and were going to ignore him, but Louis went outside because his "car alarm kept going off[.]" Robinson called 911; an audio recording of this call was played for the jury.

According to Robinson, Johnson was "already out there with a butcher knife[,]" and Robinson heard Louis "hollering, 'Dre, put the knife down[.]'" She went outside with a door bar, saw Johnson, who

"walked a long way with a butcher knife to come to [their] house[,]"[6] "going at Louis" and "sticking at Louis with the knife."[7] Robinson attempted to hit and Louis did hit Johnson with the door bar. Johnson ran in the open apartment door, where K. J. was in a car seat on the couch, and tried to close the door. Louis got inside, where Johnson "was charging at Louis with the knife, so Louis grabbed him and . . . the knife went in Louis. But Louis held [Johnson] down with the knife" as Robinson tried to "pry the knife out" of Johnson's hand, and he twice stabbed her in the hand before she threw the knife away and realized that Louis had been stabbed. Louis affirmed that Johnson had stabbed him in the chest. Johnson tried to give CPR to Louis, but Robinson stopped him, and the neighbor returned to help and restrained Johnson.

Paramedics took Louis to a hospital, where he died the next morning. An autopsy revealed defensive injuries on Louis's right

---

[6] The record makes clear that Johnson walked about three miles to get to their apartment.

[7] Robinson testified that there was no talking and that Johnson "came with rage."

arm, a small injury on his back, and a stab wound. The autopsy report classified the cause of death as a "stab wound to the chest[,]" or put another way, "the stabbing object causing a fatal injury of the heart[.]"

The neighbor who had knocked on the door, Isaiah Rogers, testified that he was walking around 7:30 or 8:00 p.m. on November 10, 2018, when a man approached and offered to pay him to knock on the door of the apartment and "let them know there's an old friend out here trying to see them." Rogers did so, and "after about five minutes" he heard screaming from that apartment. He returned and saw "Louis and the person that [he] knocked on the door for, wrestling around sort of in the yard." Johnson had a knife "wielded at" Louis, and Louis had what Rogers thought was a broom or a white stick; Rogers saw blood around the rib area of Louis's shirt and knew "that he got stabbed." Johnson then "dashed inside the house[,]" where Robinson remained, and "tried to shut the door but Louis stuck the broom inside the door[.]" Inside, Rogers saw a baby crying on the couch, Louis on top of Johnson, holding his hands

9

down, and Robinson holding his wrists down with her feet. Rogers grabbed the knife, threw it outside, and put Johnson "in [a] headlock and made sure he stayed until the police arrived." When police arrived, Rogers told them Johnson "stabbed Louis."

Rogers's former roommate, Nicholas Herndon, testified that he arrived and saw Louis bleeding on the ground, Robinson helping Louis, a baby on the couch, Johnson on the couch, and Rogers "making sure [Johnson] stayed on the couch." Herndon called 911, and an audio recording of that call was played for the jury, during which another neighbor arrived and asked what happened, and Johnson responded, "I stabbed him."

Officer Nathan Foster responded to the scene and testified that he immediately took Johnson into custody, and Johnson later volunteered "that it was self-defense."

Johnson testified in his own defense at trial and denied the following: (1) threatening Jasmine or Louis via text message, (2) breaking Jasmine's grandmother's car window, (3) telling Jasmine that he broke the car window, (4) getting in a physical fight with

10

Louis about the car window, (5) breaking the apartment window, or (6) admitting while Herndon was on the phone with 911 that he stabbed Louis. According to Johnson, on November 10, he walked to the apartment to ask if he could help financially with K. J., not knowing that the temporary restraining order meant that he could not be near his son anymore. Johnson said that Louis attacked him, so Johnson "end[ed] up having to use the knife." Johnson said that he carried the knife tucked in his pants for protection, as he often did, because he had gotten robbed before in that area.

According to Johnson, he asked the neighbor to help because he did not want to cause an altercation. Louis came outside, told Johnson "you messed up my daughter's life" and grabbed and threatened him. Louis grabbed Johnson "[u]p towards the neck area" with two hands and would not let him go, despite Johnson yelling for him to do so. Robinson came outside with a door bar, Johnson pulled out the knife, and Louis let him go. The defense elicited testimony that Louis was around six feet tall and weighed

11

248 pounds, while Johnson was around five feet and four inches tall and weighed around 110 to 118 pounds.

Johnson testified that he ran to the house to escape, not knowing that K. J. was there, and tried to leave when he saw K. J. Johnson claimed that Louis pushed open the door with the door bar, charged at Johnson, and swung the door bar. That is "when [Johnson] jab[bed] with the knife." Louis slammed him on the ground, hit him in the face, and tried to grab the knife while they tussled. Johnson broke his grip and "hit" Louis again out of fear of "what he would do if he had the knife." Louis pinned Johnson's hands down and instructed Robinson to get the knife, and Johnson opened his hand to "let her get the knife." Johnson tried to give CPR and did not try to run because he said, "I kn[e]w I didn't do anything wrong." On cross-examination, Johnson admitted that he "swung the knife as a jab" and stabbed Louis in the chest, but he insisted that it was "[i]n defense."

1. Johnson contends that the trial court plainly erred by failing to instruct the jury on the impeachment of a witness based on a

witness's bias for or against a party, on knowledge, and on the defense of accident. We disagree.

As Johnson concedes on appeal, his trial counsel did not request any of these instructions or object to their omission at trial, so we review these claims for plain error only. See OCGA § 17-8-58.[8] To establish plain error, Johnson must prove that the instructional error (1) was not affirmatively waived, (2) was clear and obvious beyond reasonable dispute, (3) likely affected the outcome of the proceedings, and (4) seriously affected the fairness, integrity, or public reputation of judicial proceedings. See *Collins v. State*, 312 Ga. 727, 738 (5) (864 SE2d 85) (2021). "An appellant must establish all four elements of the test in order to demonstrate plain error, so satisfying this test is difficult, as it should be." Id. (citation and punctuation omitted). Indeed, if an appellant fails to satisfy any one

___

[8] Under OCGA § 17-8-58 (b):

Failure to object in accordance with subsection (a) of this Code section shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. Such plain error may be considered on appeal even if it was not brought to the court's attention as provided in subsection (a) of this Code section.

13

prong of the plain error test, we need not consider the other prongs. See *State v. Kelly*, 290 Ga. 29, 34 (2) (b) n.5 (718 SE2d 232) (2011).

(a) *The trial court did not clearly err by omitting the impeachment for bias instruction.*

Johnson contends that the trial court plainly erred by failing to instruct the jury on impeachment of a witness based on a witness's bias when ample evidence supported this instruction and the trial court instructed the jury on prior difficulties evidence. "In evaluating a claim that the trial court was required to give certain jury instructions, we view the charge as a whole to determine whether the jury was fully and fairly instructed." *Clark v. State*, 315 Ga. 423, 440 (4) (883 SE2d 317) (2023) (citation and punctuation omitted); see also *Taylor v. State*, 272 Ga. 744, 745-746 (1) (534 SE2d 67) (2000) (no error in omission of instruction when charge as given substantially covered all legal principles relevant to the determination of the appellant's guilt).

Here, the trial court directed the jury to "determine the credibility of the witnesses" and to consider among other things "all

14

of the facts and circumstances of the case, including . . . their interest or lack of interest in the outcome of the case and their personal credibility[.]"[9] Even assuming that slight evidence supported an instruction on impeachment for bias, we have said that an instruction directing jurors to consider a witness's interest or lack of interest in the outcome of the case substantially covers the possible motive, interest, or bias of the State's witnesses. See, e.g., *Baker v. State*, 319 Ga. 456, 461 (2) (902 SE2d 645) (2024) (no clear error in trial court's omission of instruction on impeachment of a witness for bias); *Isaac v. State*, 319 Ga. 25, 33 (3) (901 SE2d 535) (2024)

---

[9] The full instruction was as follows:

You are not required to accept the testimony of any witnesses, expert or otherwise. Testimony of an expert, like that of all witnesses, is to be given only such weight and credit as you think it is properly entitled to receive. The jury must determine the credibility of the witnesses. In deciding this, you may consider all of the facts and circumstances of the case, including the witnesses' manner of testifying, their means and opportunity for knowing the facts about which they testify, the nature of the facts about which they testify, the probability or improbability of their testimony, their interest or lack of interest in the outcome of the case and their personal credibility as you observe it. To impeach a witness is to show that witness is unworthy of belief. A witness may be impeached by disproving the facts to which the witness testified.

(pretermitting whether slight evidence supported a charge on bias, trial court did not err when the charge as given substantially covered the declined charge); *Foster v. State*, 294 Ga. 383, 386 (7) (754 SE2d 33) (2014) (instruction that the jury determine each witness's credibility and consider each witness's interest or lack thereof in the case adequately covered the possible motive, interest, or bias of the State's witnesses). Therefore, when evaluated in the context of the jury instructions as a whole, Johnson has not shown that the trial court clearly erred in omitting the impeachment-for-bias instruction, and his claim of plain error fails.

(b) *The trial court did not clearly err by omitting the knowledge instruction.*

Johnson contends that the trial court's failure to instruct the jury on knowledge was plain error because this is an element that the State must prove beyond a reasonable doubt and this is a pattern jury instruction given in most criminal trials.[10]

---

[10] The pattern jury instruction on knowledge states:
Knowledge on the part of the defendant that the crime of [specific crime] was being committed and that the defendant

16

Here, the trial court thoroughly instructed the jury on the presumption of innocence, the State's burden of proof, the definition of a crime, and intent. These instructions adequately informed the jury that it could not find Johnson guilty if he did not knowingly and intentionally participate in the crimes. See *Sauder v. State*, 318 Ga. 791, 803-804 (5) (b) (901 SE2d 124) (2024) (no clear or obvious error when trial court failed to instruct the jury on mere presence and knowledge, because the court instructed on the presumption of innocence, the State's burden of proof, criminal intent, and parties to a crime). Accordingly, considering the jury instructions as a

knowingly and intentionally participated in or helped in the commission of such crime must be proved by the State beyond a reasonable doubt. If you find from the evidence in this case that the defendant had no knowledge that a crime was being committed or that the defendant did not knowingly and intentionally commit, participate, or help in the commission of (and was not a conspirator in) the alleged offense, then it would be your duty to acquit the defendant.

On the other hand, should you find, beyond a reasonable doubt, that the defendant had knowledge that the crime of [specific crime] was being committed and that the defendant knowingly and intentionally participated or helped in the commission of it, then you would be authorized to convict the defendant.

Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.43.10.

whole, the trial court's omission of the knowledge instruction was not a clear or obvious error, and Johnson's claim for plain error fails.

(c) *The trial court did not clearly err by omitting the instruction on the defense of accident.*

Johnson contends that the trial court plainly erred by omitting an instruction on the defense of accident. To authorize a requested jury instruction, there need be only "slight evidence to support the theory of the charge, and the necessary evidence may be presented by the State, the defendant, or both." *McIver v. State*, 314 Ga. 109, 138 (2) (g) (875 SE2d 810) (2022) (citation and punctuation omitted). The accident instruction applies "where it satisfactorily appears there was no criminal scheme, undertaking, intention, or criminal negligence." OCGA § 16-2-2. Put another way, this defense "arises when a defendant contends that his acts were accidental or a product of misfortune rather than criminal intent or negligence." *Stepp-McCommons v. State*, 309 Ga. 400, 403 (2) (a) (845 SE2d 643) (2020) (citation and punctuation omitted).

Here, Johnson contends that Robinson's testimony that Johnson stabbed Louis when Louis grabbed Johnson and held him down during the fight for control over the knife constituted slight evidence supporting the defense of accident. But this account mischaracterizes Robinson's testimony, which makes clear that *before* Louis grabbed Johnson, Johnson "was charging at Louis with the knife[.]"[11] Therefore, the testimony that Johnson points to as slight evidence actually undercuts his contention that the stabbing was an accident.

Even assuming that Johnson stabbed Louis during the fight for control over the knife, Johnson insisted at trial that he intended to brandish the knife in self-defense, and the mere fact that the stabbing may have occurred during a fight for control over the knife does not render the stabbing an accident. Although a defendant may assert both the defense of accident and the defense of self-defense,

---

[11] Indeed, Robinson testified that Johnson "was charging at Louis with the knife, so Louis grabbed him and . . . the knife went in Louis. But Louis held [Johnson] down with the knife" as Robinson tried to "pry the knife out of Johnson's hand[.]"

19

the defendant is entitled to charges on both only if slight evidence supports both charges. See *Hudson v. State*, 284 Ga. 595, 597 (4) (669 SE2d 94) (2008) (evidence supported both charges when defendant testified that she used a knife to "force" the threatening victim "to get back" but did not mean to stab him or understand how the knife became lodged in his chest). By asserting these alternative defenses, "the defendant in essence tells the jury, 'I didn't mean to [stab] the victim. But if you find that I [stabbed] him intentionally, I was justified in doing so, because it was the only way to stop him from seriously injuring me.'" *McClure v. State*, 306 Ga. 856, 861 (1) (834 SE2d 96) (2019).

Here, Johnson points to no evidence that he did not intend to stab Louis. Rather, Johnson testified at trial that he used the knife in self-defense, he "swung the knife as a jab[,]" he stabbed Louis in the chest, and he hit Louis again after the stabbing out of fear of what Louis would do if he had the knife. Given this evidence, the trial court did not clearly err by omitting the accident instruction. See *Stepp-McCommons*, 309 Ga. at 403-404 (2) (a) (no error in

20

omitting accident instruction where defendant testified he shot the victim in self-defense without intending to "murder" the victim); *Morris v. State*, 303 Ga. 192, 199-200 (V) (C) (811 SE2d 321) (2018) (accident instruction unwarranted when evidence supported only a self-defense instruction); *Dolensek v. State*, 274 Ga. 678, 681 (6) (558 SE2d 713) (2002) (no error in omitting accident instruction when evidence demonstrated only that the defendant acted intentionally "to defend himself and to scare off his attackers").

2. Johnson contends that the trial court plainly erred by admitting Jasmine's testimony that Louis previously told her that Johnson hit him on the night the car window was broken. Specifically, Johnson argues the admission of this testimony was plain error because the testimony was inadmissible hearsay and impermissible character evidence. We disagree.

As Johnson concedes on appeal, his trial counsel failed to object to the admission of this evidence, so we review this claim for plain error only. See *Merritt v. State*, 311 Ga. 875, 889 (6) (860 SE2d 455) (2021) (reviewing admission of evidence at trial without objection for

21

plain error); OCGA § 24-1-103 (d) ("Nothing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court.").

Here, even if we assume that the trial court's admission of the testimony was a clear or obvious error under any of the grounds asserted by Johnson, Johnson cannot obtain reversal because he has failed to show that the error affected his substantial rights. Rather, the contested testimony was merely cumulative of other testimony, and the evidence of Johnson's guilt was overwhelming.

To begin, Jasmine's testimony that Louis told her Johnson hit him was cumulative of Robinson's testimony describing what she heard on speaker phone during the encounter and recounting Louis's depiction of the confrontation. Therefore, Jasmine's testimony added nothing to Robinson's depiction of the confrontation and was merely cumulative of other unchallenged testimony. See *Allen v. State*, 310 Ga. 411, 416-417 (3) (851 SE2d 541) (2020) (admission of challenged testimony did not affect

defendant's substantial rights when that testimony was cumulative of other unchallenged evidence); *McKinney v. State*, 307 Ga. 129, 135 (2) (b) (834 SE2d 741) (2019) (any error in admission of conviction resulting from defendant's prior attack against the victim did not affect defendant's substantial rights when the challenged evidence was cumulative of other testimony and the jury heard substantial testimony about other prior difficulties between the defendant and the victim).

Moreover, evidence of Johnson's guilt was overwhelming. Weeks before the stabbing, a phone number associated with Johnson sent messages about Louis to Jasmine's phone number threatening that the sender was "going to beat [that] man to sleep." The jury heard substantial testimony about other prior difficulties between Louis and Johnson, including testimony regarding conflict over the broken apartment window and Johnson's role as a father, and audio recordings of various 911 calls related to prior difficulties between Jasmine, Robinson, Louis, and Johnson were played for the jury.

23

It was uncontested that Johnson walked about three miles to Louis and Robinson's apartment while carrying a butcher knife and that Johnson stabbed Louis. Two eyewitnesses besides Johnson testified that Johnson stabbed Louis. Robinson testified that she saw Johnson "going at Louis[,]" "sticking at Louis with the knife[,]" and "charging at Louis with the knife" before "the knife went in Louis." And Louis affirmed to her that Johnson stabbed him in the chest. Similarly, Rogers testified that within five minutes of knocking at Johnson's request on the apartment door, he heard screaming and returned to see Louis and Johnson "wrestling" as Johnson had a knife "wielded at" Louis. By then, Louis already had blood around his rib area, and Rogers knew "that he got stabbed." Rogers later told police that Johnson "stabbed Louis."

In addition to those eyewitness accounts, Rogers's former roommate, Herndon, testified that shortly after the stabbing he heard Johnson admit that he had stabbed Louis. Officer Foster similarly testified that Johnson volunteered that he had stabbed

Louis. And Johnson himself testified that he pulled out the knife, "jab[bed] with the knife[,]" and "hit" Louis again after the stabbing.

Accordingly, given that the contested testimony was merely cumulative of other admitted evidence and that evidence of Johnson's guilt was overwhelming, Johnson has not met his burden under the plain error standard to show a reasonable probability that the outcome of his trial would have been different absent the contested testimony, and his claim of plain error fails.

*Judgment affirmed. All the Justices concur.*

Decided August 13, 2024.

Murder. DeKalb Superior Court. Before Judge Adams.

*Frances C. Kuo, Jonathan O. Oden*, for appellant.

*Sherry Boston, District Attorney, Joshua M. Geller, Tyshawn Y. Jackson, Lenny I. Krick, Deborah D. Wellborn, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, Eric C. Peters, Assistant Attorney General*, for appellee.