NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 10, 2025

S25A0406.  JAMES v. THE STATE.

LaGrua, Justice.

A jury found Sanchez James guilty of murder, aggravated assault, and related charges for fatally shooting Roderick Billups and seriously wounding Keisha Bussey.[1] At trial, James asserted a claim of self-defense. James argues on appeal that the evidence was

---

[1] The shootings occurred on June 17, 2017. On December 8, 2017, a Fulton County grand jury indicted James for malice murder (Count 1); felony murder (Count 2); one count of aggravated assault with a deadly weapon against Billups (Count 3); one count of aggravated assault with a deadly weapon against Bussey (Count 4); and possession of a firearm during the commission of a felony (Count 5). The case was tried in October 2018, and a jury convicted James on all counts. The trial court sentenced James to life in prison on Count 1; twenty years to serve in prison on Count 4, to run concurrently with Count 1; and five years to serve in prison on Count 5, suspended, to serve consecutively to Counts 1 and 4. The remaining two counts were merged or vacated by operation of law. James moved for a new trial on November 2, 2018, amending the motion through new counsel on October 4, 2019. The trial court heard the motion on January 29, 2020, denying it on October 1, 2024. James timely filed a notice of appeal on October 17, 2024. The appeal was docketed to this Court's term beginning in December 2024 and submitted for a decision on the briefs.

insufficient to convict him. James also argues that the trial court erred by allowing a witness to improperly invoke her right against self-incrimination under the Fifth Amendment to the United States Constitution,[2] purportedly in violation of James's right to confrontation under the Sixth Amendment to the United States Constitution,[3] thereby preventing James from establishing that Billups was armed with a gun which another witness took from the scene and refused to return. For the reasons that follow, we affirm.

The evidence presented at trial showed that James was wheelchair-bound from a previous shooting. Bussey was James's former girlfriend who helped take care of James's physical needs. Bussey was in a relationship with Billups.

Bussey testified that, on the night of June 17, 2017, she and Billups walked to the corner market near her home to purchase

---

[2] The Fifth Amendment provides in pertinent part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]"

[3] The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"[4] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

groceries. As they walked back home, Bussey heard "something rattling" behind her. She turned around and saw James in his wheelchair with a "purple and black gun" "in his lap in plain view." Bussey recognized the gun because she was with James when he purchased it. Bussey asked James "what he was doing down there," whereupon James asked whether she and Billups were dating. Bussey testified that she was "scared," so she "told a lie," saying that Billups was "just walking [her] home." She testified that James "picked the gun up" and was "pointing it at [them]," "about to hurt [them]." Bussey told Billups to "take the [grocery] bags to [her] house and . . . leave."

Bussey said that as Billups "turned around and started to walk off[,]" James told Billups, "[N]o, you better not move . . . . [W]hat [are] you doing[?]"She said that James "just started shooting [Billups]." Bussey saw Billups "fall," and then James "turn[ed] to [Bussey] and he point[ed] the gun at [her]." Bussey testified that they were "[w]ithin feet" of her apartment, so she told James, "[p]lease don't shoot" because her kids were "right there in the

3

house." She testified that James responded, "b**ch, f**k you. Die," and then shot at Bussey three times, hitting her "right up under [her] left breast." She said that her body "went numb" and she "hit the ground." She heard "[s]ix or seven" shots in all. As James "roll[ed]" away, Bussey called a family member and 911 to tell them that she had been shot.

According to Bussey, prior to the shooting, Billups did not argue with James, threaten to shoot James, "get violent towards" James, "raise his voice" towards James, have a gun "at all that day," or "reach into his pocket to get a gun." Bussey further testified that she did not threaten James, and that neither she nor Billups told James that Billups had a gun.

Glenda Williams testified that she was asleep in her bedroom on the night of June 17, when she heard gunshots. She heard a female "screaming and hollering." Williams looked out the window and saw Bussey, whom Williams knew, "back[ing] up" with "her hands in the air," saying "don't do that. You know I got these kids." Williams heard a male voice respond, "f**ck you and your kids," and

4

then Williams heard two more shots. Williams "hollered out . . . [Bussey], is that you?" to which Bussey responded, "[y]es, it is." Williams saw James "rolling past" with a "gray hoodie on his head." Williams woke up her boyfriend, Anthony Watt, and they both went outside to help Bussey. Williams stayed with Bussey until emergency responders arrived. Williams testified that she did not see a gun at the scene, and did not see anyone take a gun from Billups's body or go through Billups's pockets. Watt testified that he watched Billups take "his last breath," and that no one else was "around" Billups and Bussey. Watt also said that he did not see a firearm at the scene, and he did not see anyone go through Billups's pockets.

James Sumlin testified that he was at the corner store on the night of June 17, when he heard gunshots. Sumlin went to see if he knew anyone involved. As soon as he arrived at the scene, he "grabbed" a cell phone, later identified as Billups's, "off the sidewalk." Sumlin left as soon as police arrived. Shatora Jones, who was the mother of one of Billups's children, called Sumlin on

Billups's cell phone later that night, and they agreed to meet the next morning so he could give her the cell phone, which he did. Sumlin testified that he did not see or remove any gun from the scene, and thus did not tell Jones "you ain't getting that fire back," or "you ain't getting the gun back," as James alleges.

According to dispatch records, police arrived at the scene four minutes after Bussey called 911. They found Billups lying on the ground, showing no signs of life, with what looked like a gunshot wound to the back of the head, and they found Bussey with an apparent gunshot wound to the stomach. Police encountered James about 50 yards from the scene, sitting in his wheelchair in a "fairly dark area" of the driveway of a house, with his hoodie drawn up over his head. Police searched James's "immediate area" and found a "purple and black" .380 gun "in a wooded area" "in the bushes." Police took the gun into evidence and transported James to headquarters for questioning.

At headquarters, James waived his *Miranda*[4] rights and gave

_____

[4] *Miranda v. Arizona,* 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

a recorded statement to police, which the State played for the jury. James said in his statement that he was coming from an apartment "around the way" when he heard Billups call his name, so he stopped. James and Billups "[got] to arguing" about whether James was still dating Bussey. James said Bussey told Billups to "keep walking" as she tried to stop them from arguing, that she "was pulling [Billups] back," and that "she was just really trying to split [them] up."

James also said that Billups tried to "grab [him] out of [his] chair." According to James, Bussey told him Billups had a gun and told Billups to shoot James. James said that as Billups was "going . . . in his pocket" he "told [James] he was going to shoot [him]," so James "just reacted back." James said that he shot at Billups twice, and when Billups "turned," James shot "like one more time." James admitted that he did not see Billups with a gun, that Billups did not shoot at him, and he was "in the wrong for shooting [Billups]." James said Bussey was "just in the way, [he] didn't try to shoot her." James admitted he threw the gun into the woods because he was "scared."

7

A GBI firearms expert testified that James's gun fired the .380 bullet and jacket fragments that the medical examiner recovered from Billups's body. The medical examiner testified that Billups had gunshot entrance wounds to the back of his head, his left arm, the side of his chest, and the left side of his back, which was "consistent with [Billups] being turned [from] or not facing the person who shot him." The examiner opined that the cause of Billups's death was "gunshot wounds . . . of the head and trunk," causing Billups to bleed to death in "seconds to minutes."

After the State rested its case, James called Jones to testify. Jones invoked her right against self-incrimination pursuant to the Fifth Amendment to the United States Constitution in response to many questions. However, Jones testified she was at the corner store when the shooting occurred, and when she arrived at the scene, no one was with Bussey. The ambulance arrived "a minute or two later" and took Bussey, after which Jones stayed on the scene until Billups's body was removed. Jones testified that no one "messed with" Billups's body during that time, and she did not see any gun

8

at the scene.

After Jones testified, James called two detectives who interviewed Jones, to try to establish what Jones said to them about whether Billups had a gun. James did not testify at trial.

1. James argues that the evidence was not sufficient to convict him of murder and aggravated assault. When considering a challenge to the sufficiency of the evidence as a matter of constitutional due process, we consider the evidence "in the light most favorable to the verdict," and we "evaluate whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Davenport v. State*, 309 Ga. 385, 388 (1) (846 SE2d 83) (2020) (citation omitted). In so doing, we "put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." Id. (citation and punctuation omitted).

A rational jury could find beyond a reasonable doubt that James murdered Billups and assaulted Bussey with a deadly

weapon, and that James did not act in self-defense, based on (1) Bussey's testimony that neither she nor Billups threatened James, Billups was unarmed, and James shot Billups as Billups "turned around and started to walk off"; (2) testimony from the medical examiner that Billups's wounds were consistent with him being "turned" away when he was shot; (3) testimony from several eyewitnesses that they did not see another gun at the scene, and they did not see anyone remove anything from Billups's body; 4) testimony that James shot Bussey as she said, "[p]lease don't shoot," while Bussey was "back[ing] up" with "her hands in the air" (5) expert testimony that James's gun fired the .380 bullet and jacket fragments recovered from Billups's body; and (6) James's admission to police during his custodial interview that he did not see Billups with a gun and that he was "in the wrong for shooting [Billups]." Because the evidence was sufficient as a matter of constitutional due process, this contention fails.

2. James contends that the trial court improperly allowed Jones to invoke her Fifth Amendment right against self-

10

incrimination, which, according to James, prevented him from establishing that Billups had a gun at the scene. More specifically, James argues that, but for Jones's improper invocation of her Fifth Amendment right against self-incrimination, Jones would have testified that Sumlin took Billups's gun from the scene, and when Jones asked Sumlin for the gun, Sumlin told her "you ain't getting the gun back" or "you ain't getting that fire back." James argues that the trial court's failure to compel Jones to testify to that effect violated James's right to confrontation under the Sixth Amendment pursuant to *Lingerfelt v. State*, 235 Ga. 139 (218 SE2d 752) (1975) and *Lawrence v. State*, 257 Ga. 423 (360 SE2d 716) (1987).

Jones claimed at trial that she was entitled to invoke her Fifth Amendment protection because she had charges pending against her for murder in another case, involving a child who allegedly found a handgun in Jones's home and shot another child, which occurred after Billups's death. A detective testified at James's trial that Jones told him, among other things, that the gun in her house belonged to

11

Billups.[5] Jones claimed that she was asserting her Fifth Amendment right against self-incrimination at James's trial to avoid connecting herself to the gun allegedly found in her home.[6]

Prior to Jones's testimony in this case, Jones came to court with her attorney, who announced that Jones "plan[ned] on taking the Fifth Amendment" because "[t]here [was] a weapon that could come up in conversation [in James's trial] that would be the source of her issue" in her homicide case. The trial judge offered to voir dire Jones immediately and asked the parties how they wished to proceed. James did not accept the offer to voir dire Jones, saying that he would not ask Jones questions pertaining to Jones's homicide case. Instead, James said that he planned to elicit from Jones what she "[told] the detective in this case," that is, when she allegedly asked Sumlin for Billups's gun, Sumlin allegedly said "you ain't getting the

---

[5] The detective testified that Jones gave conflicting statements about the gun, telling him that: (1) the firearm in her home "belonged to a young [man] named Roderick Billups"; (2) "she didn't have [a firearm] in her house"; (3) she "used to have a firearm in her home," which she got "off the streets, but it had been stolen weeks prior"; and (4) "she had a firearm in her closet," which was "given to her by . . . Billups . . . a week prior . . . to his murder."

[6] James does not claim that the gun allegedly found in Jones's home was the same gun that Billups was purportedly carrying when James shot him.

12

gun back." James told the trial court that "there might be some side issues of things she [said] in her statement to the detective at the time," but if the questions at trial became "an issue," then Jones "can plead the Fifth." James pointed out that if Jones did assert her Fifth Amendment right, James "could get her statements in other ways." The trial judge agreed and said that if Jones asserted her Fifth Amendment right, the trial judge could evaluate her assertion "question-by-question." owever, when James called Jones to testify, Jones repeatedly asserted her Fifth Amendment right against self-incrimination without drawing any objection or motion from James.

James's failure to object means that we review James's contention for plain error. See *Holmes v. State*, 318 Ga. 213, 221 (b) (ii) (897 SE2d 829) (2024) (holding that failure to object to purported constitutional violations allows only a plain-error review) (citation omitted). For James to show plain error, he must show an error that "(1) was not affirmatively waived, (2) was clear and obvious beyond reasonable dispute, (3) likely affected the outcome of the proceedings, and (4) seriously affected the fairness, integrity, or

13

public reputation of judicial proceedings." *Johnson v. State*, 319 Ga. 562, 567 (1) (905 SE2d 570) (2024) (citation omitted). Failure to establish any one of these elements is fatal to James's claim, ending our inquiry. See id. at 568 (1) (holding that "if an appellant fails to satisfy any one prong of the plain error test, we need not consider the other prongs") (citation omitted). Pretermitting whether James has shown any other elements of plain error, we conclude that James has failed to show an error that was "clear and obvious beyond reasonable dispute." Id. at 567 (1)

"An error cannot be plain where there is no controlling authority on point." *McKinney v. State,* 307 Ga. 129, 134 (2) (a) (834 SE2d 741) (2019) (citation and punctuation omitted). James blames the trial court for failing to conduct a hearing on Jones's invocation of her right against self-incrimination. But James points to no authority – and we have found none – requiring a trial court to sua sponte intervene after the trial court offered to voir dire a witness, the complaining party tacitly declined the offer, and then the complaining party made no motion or objection at any point during

14

the disputed testimony. Both cases to which James points involved the trial court's denial of a defendant's request for court intervention in the face of the assertion of the right against self-incrimination. See *Lingerfelt*, 235 Ga. at 139 (noting that the trial court overruled the defendant's objection "that it was incumbent on the [S]tate to determine out of the presence of the jury what questions the witness would or would not answer"); *Lawrence*, 257 Ga. at 424 (3) (noting that the defendant "sought unsuccessfully to have the nature of the questions and the propriety of [the witness's] invoking the Fifth Amendment considered out of the jury's presence").

James also does not point to any authority requiring us to determine the propriety of a witness's failure to answer questions when, as here, the complaining party never identified at trial, or on appeal, the specific questions which that witness allegedly wrongly declined to answer. See *Roberson v. State*, 300 Ga. 632, 636 (III) (797 SE2d 104) (2017) (holding that "[i]t is well established that the burden is on the party alleging error to show it by the record") (citation and punctuation omitted).

Finally, James does not point to any authority – and we have found none – supporting the proposition that the Sixth Amendment Confrontation Clause applies to a party's own witness on direct-examination. The Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses *against* him[.]" (emphasis supplied). But James called Jones as a witness, and she declined to answer questions on direct-examination. This means that Jones was not a witness against James and James was not cross-examining her. See *State v. Burns*, 306 Ga. 117, 121 (2) (829 SE2d 367) (2019) ("With respect to the right to confrontation, the Sixth Amendment provides two types of protections for a criminal defendant: the right physically to face *those who testify against him*, and the right to conduct *cross*-examination") (citation and punctuation omitted; emphasis supplied); *Johnson v. State*, 310 Ga. 685, 689 (2) (853 SE2d 635) (2021) ("The main and essential purpose of the right of confrontation is to secure for the *opponent* the opportunity of *cross*-examination.") (citations and punctuation omitted; emphasis

16

supplied). James points to no authority that the Confrontation Clause applies here except *Lingerfelt* and *Lawerence*, which are distinguishable because they turn on a witness's refusal to answer questions on cross-examination. *Lingerfelt*, 235 Ga. at 139 (reversing the appellant's conviction because he "was denied his right to a fair and sifting cross[-]examination during his trial"); *Lawrence*, 257 Ga. at 425 (3) (reversing the appellant's conviction because he "was effectively deprived of his opportunity to confront and cross-examine the witness against him").

Thus, in the absence of controlling authority, James has not shown an error that was "clear and obvious beyond reasonable dispute," so his contention fails. *Johnson*, 319 Ga. at 567 (1) (citation omitted).

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, Ellington, McMillian, Colvin, and Pinson, JJ, concur.*

17