NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia


Decided: May 13, 2025


S25A0428.  DOUGHERTY v. THE STATE.


MCMILLIAN, Justice.

Robert Kyle Dougherty appeals from his convictions for felony murder and other crimes in connection with the shooting death of Trevorius Thomas.[1] Dougherty argues (1) that the evidence was not

---

[1] The crimes occurred on January 27, 2012. In February 2013, a Monroe County grand jury jointly indicted Dougherty and Stephen Lober on malice murder (Count 1), felony murder predicated on aggravated assault with intent to rob (Count 2), felony murder predicated on possession of a firearm during the commission of a felony (Count 3), armed robbery (Count 4), possession of a firearm during the commission of a felony (Counts 5 and 6), conspiracy to commit armed robbery (Count 7), abandonment of a dead body (Count 8), and concealing the death of another (Count 9). Lober pleaded guilty prior to trial. At a jury trial in March 2014, Dougherty was found guilty of all counts except malice murder. There was no verdict on Count 4 because the State announced at the beginning of trial that it would not be proceeding on the armed robbery count. The trial court sentenced Dougherty to serve life in prison with the possibility of parole on Count 2; consecutive five-year terms in prison on Counts 5 and 6; a consecutive ten-year term in prison on Count 7; a concurrent three-year term in prison on Count 8; and a concurrent ten-year term in prison on Count 9. The trial court purported to merge Count 3 into Count 2 for sentencing purposes, but it was actually vacated by operation of law. See *Noel v. State*, 297 Ga. 698, 700 (2) (777 SE2d 449) (2015).

sufficient to support his felony murder and conspiracy to commit armed robbery convictions as a matter of constitutional due process; (2) that certain text messages should not have been admitted; (3) that the trial court erred by imposing a longer sentence than the sentence received by his co-indictee; and (4) that the trial court improperly considered certain factors in sentencing. Because we conclude that the evidence was constitutionally sufficient and that

Dougherty's first appeal to this Court was dismissed because, although Dougherty filed a timely pro se motion for new trial, it was a legal nullity as he was still represented by trial counsel at the time, and appellate counsel's motion for new trial was untimely. See S19A1281. Dougherty's next appeal was also dismissed after this Court determined that Count 4 was never formally resolved. See S22A0300. Following the trial court's entry of an order of nolle prosequi of Count 4, Dougherty's third appeal was also dismissed on the grounds that the dismissal order in S19A1281 determined that the judgment was final at that time, such that under the law of the case doctrine, the subsequent nolle prosequi order "could not give [Dougherty] a new opportunity to litigate his motion for a new trial," and the out-of-time appeal procedure was no longer available. *Dougherty v. State*, 315 Ga. 188, 190 (880 SE2d 523) (2022) (vacating trial court's order granting Dougherty's out-of-time appeal and remanding with specific direction to the trial court to vacate its order denying Dougherty's motion for new trial).

On remand, Dougherty filed a motion to correct an illegal sentence, which the trial court granted on December 8, 2022. In its order, the trial court vacated Dougherty's original sentence and resentenced Dougherty to serve the same total time as previously, except noting this time that Count 3 was vacated by operation of law. Dougherty then filed a motion for new trial, which he amended in October 2023. Following a hearing, the trial court denied the motion for new trial, as amended, on November 8, 2023. Dougherty timely filed a notice of appeal, and his case was docketed to the term of this Court beginning in December 2024 and submitted for a decision on the briefs.

2

the trial court did not abuse its discretion in admitting the text messages or in imposing Dougherty's sentence, we affirm.

The evidence at trial showed that in January 2012, Dougherty and his co-indictee Stephen Lober devised a plan to obtain money by luring Thomas to an abandoned house under the guise of selling drugs to him. Instead, Thomas was shot and killed in the course of the transaction. Thereafter, Thomas's family and girlfriend became concerned because they were not able to reach him. Stephanie Smith, Thomas's mother, started calling Thomas's friends and learned that Lober had picked Thomas up the day before.

Smith contacted Lober, and he eventually gave her Dougherty's name and number. Smith then called Dougherty, who told her, "We left [Thomas] at a house in Monroe County . . . because [he] wanted to stay out there." When Smith pressed him to tell her more, Dougherty said that Lober would have to tell her what had happened and that "he was sorry." When Thomas's father called Dougherty, Dougherty told him that Thomas was out on Zebulon Road and that Lober would have to tell him what had happened.

Thomas's stepfather also called Dougherty, who said that the last time he had seen Thomas was at Lober's home. Dougherty also said, "I give you my condolences on your son being missing." When Thomas's stepfather asked if he meant to say that Thomas was dead, Dougherty responded, "[N]o, that's not what I'm saying." At that point, Thomas's family contacted law enforcement officers for assistance.

After Thomas was reported missing, officers questioned Lober about Thomas's whereabouts. According to Lober, he had planned to sell $4,000 worth of marijuana to Thomas, and Dougherty had offered to be the driver to earn some money. Lober claimed that Dougherty drove his Jeep to pick up Thomas around 12:00 or 1:00 p.m. and stopped by Lober's house to retrieve the marijuana before Dougherty and Thomas left to complete the drug deal with Thomas's purchaser.

Officers also contacted Dougherty, who told conflicting stories about what had happened to Thomas. Initially, Dougherty repeated the story that he and Lober had taken Thomas to a house on Zebulon

Road and left him there. Dougherty explained that after they left Thomas, he went back home to get ready for a date with his girlfriend that evening and that he and his girlfriend stayed at a hotel in Americus that night.

However, he later told different officers a completely different version of events. Dougherty said that Lober had called him about a fake drug deal and told him that he could drive to make some extra money. He claimed that Lober planned to handcuff Thomas to a tree and rob him of the money that he was going to use to pay for marijuana. He and Lober went to an abandoned house on Zebulon Road and waited for Thomas to call, but Thomas's purchaser got scared and backed out of the drug deal. Lober then took Dougherty's Jeep to pick up Thomas and bring him back to the house. When Dougherty heard Lober returning, Dougherty claimed that he went to the back of the house where he had a .22-caliber long rifle. Dougherty's shotgun was propped up just inside the front door of the house. Dougherty heard Lober say, "[W]ait here. I'm going to go in the house and get it." Then another male voice replied, "[Y]ou

better." Dougherty then heard five shotgun shots. Dougherty ran to the front of the house and saw Thomas lying on the ground bleeding and Lober holding Dougherty's shotgun.

After relaying this version, Dougherty told officers that the shotgun was in the bedroom of his home[2] and agreed to direct the officers to the abandoned house on Zebulon Road where he and Lober had left Thomas. When they arrived, officers saw what appeared to be a body lying on the ground; based on the house's location, they contacted the Monroe County Sheriff's Office to take over the case. After Dougherty was taken into custody by Monroe County deputies, he agreed to waive his rights under *Miranda*[3] and give an interview. A copy of the recorded interview was played for the jury at trial.

At the outset of the interview, Dougherty stated, "I'm sure that anything that happens beyond this point, I probably deserve for

---

[2] Officers later executed a search warrant and found a rifle and the shotgun used in the shooting in Dougherty's bedroom.

[3] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

6

some reason." Dougherty later admitted that he knew about the plan to rob Thomas before he and Lober went to Bass Pro Shop to purchase buckshot with Dougherty's gift card because Dougherty only had birdshot for his shotgun.[4] Lober had suggested that they buy better ammunition in case things went "south" with Thomas. Although he claimed that Lober planned to handcuff Thomas to a tree, take his money, and leave him there, Dougherty admitted that he never saw any handcuffs or marijuana that day. According to Dougherty, "I guess in my mind, I figured [Thomas] is some drug dealer. I guess I really shouldn't care." He later explained that he was so desperate for money that he "just kind of cancelled out the thought that, yeah, we're going to go do something bad . . . rob some random drug dealer I've never met before . . . why should I feel bad for it."

---

[4] Surveillance footage of Dougherty and Lober leaving the Bass Pro Shop around 9:00 a.m. on the morning of the shooting was played for the jury at trial. A copy of a receipt for the purchase of ammunition, reflecting payment with a Bass Pro Shop gift card matching the number of the gift card recovered from Dougherty's Jeep, was also admitted at trial.

Dougherty also admitted that he was waiting in the back room of the house on Zebulon Road with a rifle because Lober had told him, "[J]ust in case something bad were to happen, I need to count on you to come out there to cover me in case he starts shooting at me or I start shooting at him or something." Dougherty claimed, however, that he had told Lober "multiple times" that "unless he actually draws on you, I do not want you to shoot somebody for something so stupid as this, as money." Dougherty said that he yelled at Lober for shooting Thomas, and Lober responded that Thomas was "talking a lot of s**t to him" and was pointing a gun at him, threatening that "there's gonna be a price to pay" if Lober did not deliver the drugs. Dougherty, however, never saw a gun on or near Thomas's body.

Dougherty also admitted to helping Lober cover up their crimes after the shooting. Dougherty replaced the buckshot with the original birdshot ammunition. He and Lober burned their clothes in

Dougherty's back yard,[5] and Lober buried the unused buckshot in the woods behind Dougherty's house. Dougherty told investigators that he had not spoken or texted with Lober since then.

However, a review of Dougherty's cell phone showed that Lober and Dougherty called and texted each other's cell phones multiple times in the days leading up to and after Thomas's death. Cell phone records also showed that the day before the shooting, Lober and Thomas agreed to meet and that Lober would "take thirty-four hundred for the P and I'll handle my uncle," whom Lober said he had to pay.[6] Thomas responded, "Naw, I'll just let you credit it. Just make sure everything's legit tomorrow."

A total of five shotgun shells were located at the scene of the shooting; three were recovered from the front porch, and two were recovered from just inside the front door. A firearms expert testified that the shells recovered from the scene had been fired from the shotgun recovered from Dougherty's bedroom. Investigators

---

[5] After executing a search warrant, officers discovered a "burn bowl" behind Dougherty's home.

[6] The officer testified that he believed "P" to mean "pot" or "product."

discovered that Thomas's pants were partially down, and the contents of Thomas's pockets had been emptied. Thomas's cell phone was discovered in his hand, but no weapon was found near his body.

The medical examiner who performed the autopsy testified that Thomas had been shot multiple times, with some shots at close range (between two and five feet) and others from further away (approximately ten to twelve feet). He could not determine how many times Thomas had been shot because the shotgun pellet injury patterns crisscrossed and intermingled; nor could he say whether Thomas had been shot by one or two shooters.

1. Dougherty first asserts that the evidence was insufficient as a matter of constitutional due process to support his convictions for felony murder predicated on aggravated assault and conspiracy to commit armed robbery. Specifically, Dougherty argues that the evidence showed that he believed he was only going to be a driver for Lober to conduct a drug transaction and that the State failed to show there was an agreement between Dougherty and Lober to commit armed robbery. We are not persuaded.

When evaluating the sufficiency of the evidence as a matter of constitutional due process, we view the evidence presented at trial in the light most favorable to the verdicts and consider whether it was sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). In doing so, we "leave[] to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Wilkerson v. State*, 317 Ga. 242, 245 (1) (892 SE2d 737) (2023) (citation and punctuation omitted).

Here, Dougherty admitted to agreeing to be the driver for Lober and to supplying the vehicle, the shotgun, the rifle, and new ammunition in the hours leading up to Thomas's shooting. He assisted Lober in identifying the abandoned house that they lured Thomas to. Dougherty also told detectives that he was so desperate for money that he "just kind of cancelled out the thought that, yeah,

11

we're going to go do something bad . . . rob some random drug dealer I've never met before . . . why should I feel bad for it." Dougherty also admitted to helping Lober cover up their crimes after the shooting.

We conclude that the evidence here was sufficient to authorize the jury to find Dougherty guilty, at a minimum, as a party to the crimes[7] of felony murder and conspiracy to commit armed robbery. "[C]riminal intent may be inferred from presence, companionship, and conduct before, during, and after the offense." *Baker v. State*, 320 Ga. 156, 161 (2) (907 SE2d 824) (2024) (citation and punctuation omitted). The evidence recited above was sufficient to support a finding that Dougherty agreed to a plan to rob Thomas and possessed the requisite intent to commit the crimes of felony murder

---

[7] See OCGA § 16-2-21 ("Any party to a crime who did not directly commit the crime may be indicted, tried, convicted, and punished for commission of the crime upon proof that the crime was committed and that he was a party thereto."); OCGA § 16-2-20 (b) (1)–(4) (A person is a party to a crime if he "[d]irectly commits the crime," "[i]ntentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime," "[i]ntentionally aids or abets in the commission of the crime," or "[i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime.").

predicated on aggravated assault and conspiracy to commit armed robbery. See *McIntyre v. State*, 312 Ga. 531, 535 (1) (863 SE2d 166) (2021) (a shooting is a reasonably foreseeable consequence of an armed robbery and the jury was authorized to find defendants guilty of conspiracy to commit armed robbery and felony murder where they agreed to commit an armed robbery, took a substantial step toward committing that offense and an overt act in furtherance of the conspiracy, and caused a death in the process); *Frazier v. State*, 308 Ga. 450, 454 (2) (b) (841 SE2d 692) (2020) (evidence was sufficient to support appellant's conviction for felony murder where he admitted to accompanying his accomplices to the park to confront someone and that they planned to rob that person in the course of a purported drug deal); *Leanos v. State*, 303 Ga. 666, 668-69 (1) (814 SE2d 332) (2018) (evidence sufficient despite testimony that appellant did not participate in planning the crimes because evidence showed that appellant became aware of the plan before the shooting, agreed to be the get-away driver, and helped to conceal the firearm used in the crimes).

2. Dougherty next asserts that the trial court abused its discretion in admitting evidence of two text messages with Lober concerning Dougherty's sexual activity following the shooting. Relying on OCGA § 24-4-403 ("Rule 403"),[8] Dougherty argues that these messages were not probative of the charged crimes and were particularly prejudicial because many people, including jurors, "believe that premarital sex is a moral sin." We are not persuaded.

The record shows that just prior to the start of trial, the parties agreed to stipulate that certain phone records would be admissible, including text messages between Dougherty and Lober. However, during trial, Dougherty objected to the admissibility of two text messages regarding his sexual activity the night of the shooting on relevancy grounds, arguing that "[t]his is character evidence of no probative value." The State responded that it was not seeking to admit the messages as character evidence; rather, the messages

---

[8] This statute provides: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

14

were directly relevant to the charged crimes because they contradicted Dougherty's statement to detectives that he did not speak with Lober following the shooting and because they contradicted Dougherty's theory of the case that Dougherty only acted as a follower to Lober, who was the leader. The trial court ruled that discussions between the two co-indictees about activities that took place just hours after the crimes were relevant to the commission of the crimes. Thereafter, one of the investigating officers testified that at 3:21 a.m. the morning after the shooting, Dougherty's cell phone texted to Lober, "[G]uess who's no longer a virgin?" At 4:50 a.m., Lober's cell phone responded, "[M]y boy."

Assuming without deciding that Dougherty properly preserved a Rule 403 objection to this evidence, we conclude that the trial court did not abuse its discretion in admitting this evidence. "A trial court's decision to exclude evidence under Rule 403 is an extraordinary remedy which should be used only sparingly." *Mills v. State*, 320 Ga. 457, 464 (3) (b) (910 SE2d 143) (2024) (citation and punctuation omitted). Under Rule 403's balancing test, relevant

15

evidence "should be excluded if it constitutes matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Hood v. State*, 309 Ga. 493, 500-01 (2) (847 SE2d 172) (2020) (cleaned up). And in reviewing a trial court's admission of evidence under Rule 403, "we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Pierce v. State*, 319 Ga. 846, 857 (5) (907 SE2d 281) (2024) (citation and punctuation omitted).

As found by the trial court, the two text messages were relevant to show Dougherty's state of mind in the hours after committing the crimes. Moreover, the text messages contradicted Dougherty's statement that he had no contact with Lober following the shooting and thus were relevant and probative to that point, even though, as Dougherty points out, other text messages that were admitted also showed their communications after the murder.

As for unfair prejudice, any prejudice from the two text messages alone was blunted because the jury also heard from one of

16

the initial investigating officers that Dougherty told him that he had left Thomas on Zebulon Road and then went home to shower for a date with his girlfriend, with whom he stayed at a hotel overnight in Americus. And, despite Dougherty's characterization of the challenged text messages, references to a sexual relationship between Dougherty and his girlfriend are not particularly prejudicial in a case involving charges of felony murder and conspiracy to commit armed robbery. See *Naples v. State*, 308 Ga. 43, 54 (3) (a) (838 SE2d 780) (2020) (challenged testimony was not particularly disparaging of appellant's character when viewed in context). Finally, given the other strong evidence of Dougherty's participation in the crimes, including his own admissions, it is not likely that the jury found Dougherty guilty solely because he had premarital sexual relations with his girlfriend. For these reasons, Dougherty has failed to show that any unfair prejudice from the text messages substantially outweighed their probative value, and this enumeration fails. Cf. *McIver v. State*, 314 Ga. 109, 151 (3) (g) (875 SE2d 810) (2022) (rejecting appellant's Rule 403 argument that

17

testimony regarding his statement to a doctor after the shooting injected racial bias into the trial because the statement was closely linked in time and circumstances to the shooting and was an integral part of the account and concluding that even though it was not particularly probative, it also was not particularly prejudicial).

3. Dougherty argues that the trial court erred in sentencing him as compared to Lober's sentence and that this disparity constitutes a "due process violation under Georgia's Constitution," citing death penalty cases in which we have considered whether the "sentence of death is excessive or disproportionate to the penalty imposed in similar cases" under OCGA § 17-10-35. In particular, Dougherty argues that there is "no justifiable reason" that he received 15 more years to serve than Lober, "other than being punished for going to trial."[9]

Dougherty's claim fails because disproportionate sentencing review is not mandated in non-death penalty cases. That is because the statutory provision requiring disproportionate sentencing

---

[9] Lober's sentence is not included in the record of this case.

review by this Court only applies to death penalty cases. See *Harvey v. State*, 300 Ga. 598, 605 (7) (797 SE2d 75) (2017) ("No such [disproportionate sentencing] review is mandated in non-death penalty cases."), overruled in part on other grounds by *Nalls v. State*, 304 Ga. 168 (815 SE2d 38) (2018); OCGA § 17-10-35 (c) (3) ("With regard to the sentence, the [Supreme Court] shall determine: . . . [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.").

And although Dougherty references a due process violation under the Georgia Constitution, Dougherty cites no authority under the due process clause, and we are not aware of any, that requires this Court to engage in disproportionate sentencing review between co-indictees in non-death penalty cases. Moreover, to the extent that Dougherty now argues that the Georgia Constitution's due process clause required the trial court to sentence Dougherty proportionately with Lober, Dougherty did not make any such objection at sentencing, so this argument is not preserved on

19

appeal.[10] Cf. *Marshall v. State*, 309 Ga. 698, 702-03 (3) (848 SE2d 389) (2020) (error relating to recidivist sentences waived when defendant did not make the argument at sentencing and the sentences imposed fell within the statutory range of punishment).

4. Finally, Dougherty complains that at his sentencing, the trial court made comments that were not supported by the evidence when it speculated that Lober and Dougherty might have taken turns shooting Thomas and that Dougherty was just as guilty as Lober. Dougherty also argues that the trial court should not have mentioned "Dougherty's date" with his girlfriend at sentencing because it should not have been allowed into evidence.

"[A] trial court, in imposing a sentence, may consider any evidence that was properly admitted during the guilt-innocence phase of the trial, as well as the conduct and attitude of the defendant during trial. The trial court is not, in other words, limited to considering only those facts that the jury finds are proven beyond

---

[10] The trial court sentenced Dougherty within the statutory ranges of punishment for his convictions, and Dougherty does not claim otherwise.

a reasonable doubt." *Wilson v. State*, 315 Ga. 728, 741 (9) (883 SE2d 802) (2023) (citations and punctuation omitted).

Here, the trial court's comments that Dougherty may have taken turns with Lober in shooting Thomas, and thus was as guilty as Lober, were reasonable inferences based on the evidence admitted at trial, which included that Dougherty supplied the shotgun and ammunition that was used to kill Thomas, Dougherty's conflicting stories about his participation in the crimes, and the medical examiner's inability to identify the number of shooters. Moreover, as explained in Division 2, the trial court did not abuse its discretion in admitting evidence about Dougherty's sexual relations with his girlfriend. Because the trial court did not rely on improper considerations in sentencing Dougherty, this enumeration of error fails.

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, Ellington, LaGrua, Colvin, and Pinson, JJ, concur.*